J-A16015-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: T.L.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: F.D., FATHER | No. 3997 EDA 2017 |

Appeal from the Decree Entered November 28, 2017
In the Court of Common Pleas of Philadelphia County
Domestic Relations at No(s):
CP-51-AP-0000496-2017
CP-51-DP-0000592-2015
FID: 51-FN-000492-2015

BEFORE: BENDER, P.J.E., LAZARUS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED SEPTEMBER 07, 2018**

F.D. ("Father") appeals from the decree entered on November 28, 2017, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated his parental rights to his minor child, T.L.H. ("Child") (born in March of 2013).[1] Additionally, Father's counsel has filed a petition to withdraw and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). Upon review, we grant counsel's petition to withdraw and affirm the termination decree.

The trial court summarized the factual and procedural history of this matter as follows:

> [Mother] is the biological [m]other of [Child].

_____

[1] T.A.H. ("Mother") voluntarily relinquished her parental rights to Child by separate decree entered by the trial court on the same date.

[Father] is the biological [f]ather of [Child] and is listed as the [f]ather on [] Child's birth certificate.

[Mother] has another [c]hild currently under [the Department of Human Services (DHS)] supervision: Z.H., [born in February of 2014]....[2], [3]

On March 2, 2015, … [DHS] received a General Protective Services (GPS) Report alleging that Mother left [] Children, [T.H.] and Z.H.[,] in the care of their maternal grandmother, M.H. [("Maternal Grandmother")], who was unable to care for them; that Mother frequently left [] Children with either [M]aternal [G]randmother … or other family and friends; and that Mother did not want to take responsibility for parenting [] Children. The Report also alleged that Mother recently left [] Children with a family friend, who contacted the police, and that the police requested that Mother retrieve them before they were taken to DHS. The Report further alleged that there was no information available regarding [] Children's [f]athers, [F.D.] and N.I. This Report was determined to be valid.

On March 2, 2015, DHS went to the home of [M]aternal [G]randmother … who stated that Mother had retrieved [] Children from the home and that the family's whereabouts were unknown to her. [Maternal Grandmother] provided DHS with the cellular telephone number of Mother.

On March 2, 2015, DHS telephone [*sic*] Mother and notified her of the GPS Report[.] Mother stated that she was with [] Children but not at home and that she would be able to meet with DHS at [Maternal Grandmother's] home on March 3, 2015.

On March 3, 2015, DHS went to [Maternal Grandmother's] home, but no one was present. DHS left a notification letter requesting that Mother contact DHS regarding the safety of [] Children.

On March 3, 2015, DHS again telephoned Mother, who stated that she had left [] Children in the care of one of their paternal grandmothers, who she did not identify. Mother also stated that she would be able to meet with DHS later on that day

---

[2] The record identifies N.I., a/k/a N.E., as the biological father of Z.H.

[3] T.L.H. and Z.H. are referred to collectively herein as "Children".

at [Maternal Grandmother's] home; subsequently, Mother failed to do so.

By March 4, 2015, DHS was unable to contact Mother and [Maternal Grandmother] via telephone because they did not answer or return calls.

On March 7, 2015, [] Children's maternal aunt, C.G., contacted DHS and stated that [] Children were in her care after Mother left them on the porch without her knowledge or consent. C.G. also stated that when she contacted Mother, Mother stated that C.G. could care for [] Children. DHS instructed C.G. to take [] Children to DHS on March 9, 2015.

On March 9, 2015, C.G. transported [] Children to DHS. DHS obtained an [O]rder of Protective Custody (OPC) for [] Children. The Community Umbrella Agency (CUA)[,] Turning Points for Children (TPFC)[,] placed [] Children in [f]oster [c]are.

As of March 9, 2015, Father … was incarcerated at Montgomery County Correctional Facility for violation of probation.

A Shelter Care Hearing was held on March 11, 2015[,] for [Child] before the Honorable Jonathan Q. Irvine. The [OPC] was lifted and legal custody transferred to DHS, and placement of Child to [f]oster [c]are. Visitation is set forth as Mother to have supervised visits with Child at the Agency. Child is safe as of 3/10/2015.

An [a]djudicatory [h]earing was held for [] Child on March 19, 2015, before … [Judge] Irvine. Legal [c]ustody of [] Child remains with DHS, and physical custody of [] Child shall continue in [f]oster [c]are through CUA [TPFC]. Child is [a]djudicated [d]ependent. Mother's visitation continued as supervised as arranged by Agency. Child is doing well, and DHS/CUA [is] to apply for Child's birth certificate, if necessary, and make [an] effort to place Child with sibling. Mother [was] referred to [a Clinical Evaluation Unit (CEU)] for assessment, [and a] full drug and alcohol screen dual diagnosis. Father is … currently incarcerated in Montgomery County Facility #31632285.

On March 30, 2015, CUA held a Single Case Plan (SCP) [m]eeting. The parental objective for Father … was to participate in CUA services. Mother participated in the SCP [m]eeting. Father did not participate in the SCP [m]eeting.

A [p]ermanency [r]eview [h]earing was held on June 17, 2015, before the Juvenile Court [h]earing [o]fficer, Alexis Ciccone. The [c]ourt ordered the legal custody of [] Child to remain with DHS, and placement to continue in [f]oster [c]are. Child is referred for forthwith medical evaluation. Mother is referred to CEU for assessment, full drug and alcohol screen, dual diagnosis….

On November 9, 2015, CUA held a[n] [SCP] [m]eeting. The parental objectives for Father … were to secure stable housing and to maintain employment. Parents failed to participate in the SCP [m]eeting.

A continuation of the case was granted on December 9, 2015, because Child Advocate was not available, and CUA [TPFC] failed to appear at the [h]earing. Child [was] to remain as committed.

On February 22, 2016, CUA held a[n] [SCP] [m]eeting. The parental objectives for Father … were to contact CUA and to participate in CUA services. Mother participated in the SCP [m]eeting. Father failed to participate in the SCP [m]eeting….

On August 23, 2016, CUA held a[n] [SCP] [m]eeting. The parental objectives for Father … were to contact CUA and to participate in CUA services. All [p]arents failed to participate in the SCP [m]eeting.

A continuation of the case was granted by the [c]ourt on August 25, 2016, because the Honorable Vincent W. Furlong recused himself from hearing the case because he previously represented [] Child.

A continuation of the case was granted by the [c]ourt on October 4, 2016, because Mother's counsel was not available for the hearing.

On November 16, 2016, CUA held a[n] [SCP] [m]eeting. The parental objectives for Father … were to contact CUA and to participate in CUA services. Mother participated in the SCP [m]eeting, however, both [f]athers did not participate in the SCP [m]eeting.

A continuation of the case was granted by the [c]ourt on November 22, 2016, because Father's counsel requested the matter be heard by a [j]udge. Child is safe as of 11/21/2016.

A Permanency Review hearing was held on January 12, 2017, before … [Judge] Irvine. The [c]ourt ordered the legal custody of [] Child to remain with DHS, and placement to continue in [f]oster [c]are through Children's Services. Child may be moved to a pre-adoptive home prior to the next [c]ourt date by agreement of CUA and Child Advocate. Mother is re-referred to CEU for assessment, dual diagnosis and 3 randoms before next [c]ourt date. Supervised visitations with Mother and Father shall occur at the Agency. CUA is to complete a home assessment in Mother's home. Child is safe as of 1/05/2017.

On April 9, 2017, Father was arrested and charged with manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance in violation of the Controlled Substance Act (CSA), intentional possession of a controlled substance by a person not registered under the CSA and conspiracy.

A Permanency Review Hearing was held on May 17, 2017, before the Honorable Allan L. Tereshko. The [c]ourt ordered the legal custody of [] Child to remain with DHS, and placement to continue in [f]oster [c]are through [TPFC]. Child is doing well. [DH]S did [a Parent Locator Search (PLS)] on Father currently incarcerated at [Community Education Center (CEC)] Hoffman, PP#970750. Case continued due to Mother now contesting [the] hearing. Child to remain as committed, and is safe as of 5/09/2017.

A Permanency Review Hearing was held on September 20, 2017, before … [Judge] Tereshko. The [c]ourt ordered the legal custody of [] Child to remain with DHS, and placement to continue in [f]oster [c]are through [TPFC]. All parties to sign voluntary relinquishment petitions within 20 days.

## Terminations Hearings – 9/20/2017 and 11/28/2017

On September 20, 2017, this [c]ourt held the first hearing as to the Involuntary Termination of Parental Rights and Goal Change Petitions filed on May 1, 2017, against Mother and Father. The parents did not attend the hearing[;] however, both were represented by their respective attorneys.

Megan Fitzpatrick, counsel for DHS, requested all attorneys to stipulate to the Statements of Facts, and if the witness were called to testify, she would testify consistent with the Statement of Facts as it relates to Mother and both fathers and the single

case objectives, and the current status of goal for adoption at this time. All attorneys present stipulated on the record.

Alisha Stewart, Case Manager, CUA [TPFC], was the first witness to testify. She noted [] Children are placed in a pre-adoptive [f]oster [h]ome through the Agency, and she last saw [Child] and his sibling, Z.H., in the home on 9/19/2017. Ms. Stewart testified reunification with Mother has been ruled out because Mother has not been consistent with her SCP objectives, and desires to sign Voluntary Relinquishment documents regarding her parental rights.

Ms. Stewart testified as to Father[,] … who was currently incarcerated at a Montgomery County Correctional Facility, [that] she spoke to him on the telephone and he desired to signed [*sic*] Voluntary Relinquishment documents for [] Child. She testified Father has not had consistent contact with [] Child, and [] Child would not suffer irreparable harm if Father's parental rights were terminated.

Jessica Estevez, Case Manager Supervisor, CUA [TPFC], was the next witness to testify. She noted she is the current Supervisor on this case and that [] Children came into care in March 201 [*sic*], because Mother had left them with a family member. She noted that Mother was not consistent with visiting her Children. Mother did not comply with the SCP objectives. As to Father, Ms. Estevez testified that neither of the [f]athers were involved with [] Children's care.

This [c]ourt then closed the evidentiary record as to both Children and agreed to hold the matter under advisement until [] Mother and Father sign Voluntary Relinquishments and gave it a 60 day review date.

On November 28, 2017, this [c]ourt held the second hearing as to the Involuntary Termination of Parental Rights and Goal Change Petitions filed on May 1, 2017, against Mother and Father. Both Mother and Father attended the hearing, and both were represented by their respective attorneys.

Caitlin Dustin, counsel for DHS noted that Mother had signed the Voluntary Relinquishment documents on September 29, 2017, and did not file a written revocation to DHS to revoke those documents. This [c]ourt found that Mother's execution of the documents were done of her own free will and no promises were made. Mother did not file written retractions, and by operation of

law, Mother's parental rights as to both of her Children were terminated at this hearing.

[] Father … testified he did not want to voluntarily terminate his parental rights to [] Child…. Therefore, this [c]ourt proceeded on the involuntary termination on the record as it was developed at the last hearing on September 20, 2017. The [c]ourt found [] Child was not in Father's care at the time of placement in DHS custody, and concluded Sections 2511(a)(1) and (2) were satisfied. The [c]ourt also found that it would be in the best interest of [] Child for Father's parental rights to be terminated, and the goal be changed to adoption for [] Child.

Trial Court Opinion ("TCO"), 2/1/18, 2-12 (citations to record omitted).

The trial court issued a decree dated November 28, 2017, terminating Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. On December 7, 2017, Father filed a timely notice of appeal. In lieu of filing a Rule 1925(b) concise statement of errors complained of on appeal, Father's counsel filed a statement of intent to file an **Anders** brief.

On March 8, 2018, counsel filed with this Court a petition to withdraw and **Anders** brief. Before reaching the merits of Father's appeal, we must first address counsel's request to withdraw. **See Commonwealth v. Rojas**, 874 A.2d 638, 639 (Pa. Super. 2005) ("'When faced with a purported **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.'") (quoting **Commonwealth v. Smith**, 700 A.2d 1301, 1303 (Pa. Super. 1997)). "In **In re V.E.**, … 611 A.2d 1267 ([Pa. Super.] 1992), this Court extended the **Anders** principles to appeals involving the termination of parental rights." **In re X.J.**, 105 A.3d 1, 3 (Pa. Super. 2014). To withdraw pursuant to **Anders**, counsel must:

1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [**Anders**] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

**Commonwealth v. Cartrette**, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citing **Commonwealth v. Lilley**, 978 A.2d 995, 997 (Pa. Super. 2009)).  With respect to the third requirement of **Anders**, that counsel inform the appellant of his or her rights in light of counsel's withdraw, this Court has held that counsel must attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights.  **Commonwealth v. Millisock**, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, an **Anders** brief must comply with the following requirements:

(1)   provide a summary of the procedural history and facts, with citations to the record;

(2)   refer to anything in the record that counsel believes arguably supports the appeal;

(3)   set forth counsel's conclusion that the appeal is frivolous; and

(4)   state counsel's reasons for concluding that the appeal is frivolous.  Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, 978 A.2d at 361.

In the instant matter, counsel has filed a petition to withdraw, certifying that she has reviewed the case and determined that Father's appeal is wholly

frivolous. Counsel also has filed a brief that includes a summary of the history and facts of the case, the issues raised by Father, and counsel's assessment of why those issues are meritless, with citations to relevant legal authority. Counsel has attached to her brief a copy of her letter to Father, advising him that he may obtain new counsel or raise additional issues *pro se*. Accordingly, counsel has substantially complied with the requirements of **Anders** and **Santiago**. **See Commonwealth v. Reif**, 117 A.3d 777, 781 (Pa. Super. 2015) (observing that substantial compliance with the **Anders** requirements is sufficient). We, therefore, may proceed to review the issues outlined in the **Anders** brief. In addition, we must "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." **Commonwealth v. Flowers**, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Counsel's **Anders** brief lists the following in the section entitled Statement of the Questions Involved:

A. Whether the trial court erred in involuntarily terminating [] Father's parental rights pursuant to [sections] 2511(a)(1), 2511(a)(2), 2511(a)(5), [and] 2511(a)(8)[,] where it was not supported by clear and convincing evidence when [] Father completed a substantial portion of his FSP/SCP goals?[4]

B. Whether the trial court erred in involuntarily terminating [] Father's parental rights where there was a bond between [] Father and Child and the termination of parental rights would

---

4 Counsel is incorrect in stating that Father's parental rights were terminated pursuant to sections 2511(a)(1), (2), (5), and (8) of the Adoption Act. As discussed in greater detail, *infra*, Father's parental rights were terminated pursuant to sections 2511(a)(1), (2), and (b).

have a negative effect on the developmental, physical and emotional needs of [Child]?

***Anders*** brief at 5.

We consider these issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to sections 2511(a)(1), (2), and (b). We need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under sections 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> …
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> …
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1)

- 11 -

repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008).

Moreover, this Court has previously stated:

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* Where a parent does not "exercise reasonable firmness in declining to yield to obstacles, his [parental] rights may be forfeited." *In re A.S.*, 11 A.3d

473, 481 (Pa. Super. 2010). With respect to the application of section 2511(a)(2) to an incarcerated parent, the Pennsylvania Supreme Court held:

> [I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

**S.P.**, 47 A.3d 817, 830 (Pa. 2012).

Instantly, the trial court found the evidence to be "clear, direct, weighty, and convincing that Father cannot, nor will [he] be able to[,] remedy the conditions which brought Child into [the] [c]ourt's supervision. Nor is the [c]ourt persuaded that Father will be able to fulfill his parental responsibilities in the future." TCO at 16. The court emphasized Father's incarceration and lack of contact with Child. **Id.** at 14-16.

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by terminating Father's parental rights pursuant to section 2511(a)(2). Child was never in the care of Father. In fact, Father was unable to care for Child, as he was incarcerated for a large portion of this case, and in the short period of time that he was out of custody, he failed to reach out to DHS or attempt to have any contact with Child. Moreover, at the termination hearing, DHS presented the testimony of Ms. Stewart, indicating that she spoke to Father on the telephone and that he expressed his desire to sign voluntary relinquishment documents for Child.

*Id.* at 16. Ms. Estevez further testified that Father was not involved with Child's care. *Id.*

At the time the court entered its termination decree, on November 28, 2017, Child had been in foster care for nearly three years. During that time, there is no evidence that Father attempted to make any contact with Child. Thus, the record supports the finding of the trial court that Father has been incapable of providing Child with the essential parental care, control, and subsistence necessary for his mental and physical well-being, and that Father is unable to remedy the causes of his parental incapacity. Father is not entitled to relief.

We next consider whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(b). We have discussed our analysis under section 2511(b) as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted).

- 14 -

Here, the trial court found that terminating Father's parental rights would best serve Child's needs and welfare. **See** TCO at 16-18. The court reasoned that there is no bond between Father and Child, and that Child will not suffer irreparable harm if Father's parental rights are terminated. **Id.** at 17. In support of its decision, the trial court stated that it "heard competent, credible evidence from both Ms. Stewart and Ms. Estevez … regarding Father's absence in [] Child's life. Both Agency workers provided credible, persuasive testimony and opined [] Child would not suffer irreparable harm if Father's parental rights were terminated." **Id.** After careful review, we again deem the court's position to be well-supported by the record, and we discern no abuse of discretion by the trial court.

Accordingly, our independent review of Father's claims demonstrates that they do not entitle him to relief. Moreover, our review of the record does not reveal any non-frivolous issues overlooked by counsel. **See Flowers**, 113 A.3d at 1250. Therefore, we grant counsel's petition to withdraw, and affirm the trial court's decree.

Petition to withdraw granted. Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/7/18

- 15 -